**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

**DYLAN GUILLOT**                    **CIVIL ACTION NO. 23-1369**

                                    **SECTION P**

**VS.**

                                    **JUDGE TERRY A. DOUGHTY**

**WARDEN WADE, ET AL.**              **MAG. JUDGE KAYLA D. MCCLUSKY**

**<u>REPORT AND RECOMMENDATION</u>**

Plaintiff Dylan Guillot, a prisoner at Madison Parish Correctional Center proceeding pro se and in forma pauperis, filed this proceeding on approximately September 29, 2023, under 42 U.S.C. § 1983. He names the following defendants: Warden Wade, Warden Cupp, Warden Dear, Chief Marble, Captain Shaw, Sergeant Boone, Sergeant Jones, Deputy Austin, Deputy Morris, Deputy Chapman, Lieutenant Alan, Lieutenant Rodgers, Lieutenant Nicky, Deputy Cogan-Beck, Sergeant Franks, Deputy Harville, and Deputy Hoff.[1]

For reasons below, the Court should retain: (1) Plaintiff's claims that Deputy Morris and Deputy Austin failed to protect him from cutting himself; (2) Plaintiff's claim of constitutionally inadequate medical care against Defendants Alan, Morris, and Austin; (3) Plaintiff's claim that Lieutenant Rodgers failed to provide or arrange medical care while Plaintiff was in a suicide cell; and (4) Plaintiff's excessive force claim against Deputy Hoff. The Court should dismiss Plaintiff's remaining claims, including his requests for declaratory and injunctive relief.

---

[1] This matter has been referred to the undersigned for review, report, and recommendation under 28 U.S.C. § 636, and the standing orders of the Court.

## Background

Plaintiff states that on August 24, 2023, at Richland Parish Detention Center ("RPDC"), at approximately "6-9 p.m.," he informed Deputy Morris that he was having suicidal thoughts, and he "requested to go on suicide watch." [doc. # 6, p. 3]. Morris said, "ok," and "returned to pill call[.]" [doc. # 25, p. 4]. Plaintiff suggestively claims that Morris failed to protect him from self-harm, alleging that "Morris refused medical care even while being the on duty nurse . . . ." *Id.* at 7.

"After about an hour without any action taken [Plaintiff] spoke to [Deputy] Austin." [doc. # 6, p. 3]. He told Morris and Austin he was suicidal one hour before he attempted suicide. [doc. # 25, p. 7]. Austin "said, 'we don't have any room,' when [Plaintiff] requested to go on suicide watch." *Id.*

Plaintiff began cutting his wrist with a razor, causing approximately 10 cuts 2-4 inches in length. [doc. #s 6, p. 3; 25, pp. 4-7]. Another inmate beat on the cell door and screamed, "He's trying to kill himself." [doc. # 25, p. 4]. Deputy Austin arrived five minutes later and contacted Defendant Alan. *Id.* Lieutenant Alan removed Plaintiff from the cell and stated: "You aint trying to kill yourself! But at least you're cutting in the right direction!" [doc. # 6, p. 3]. Plaintiff was then placed in a hallway unattended and without medical attention while Lt. Alan and other deputies questioned other inmates that were in the cell about what happened. [doc. #s 6, p. 3; 25, pp. 4, 7]. Defendants Alan, Morris, and Austin thereafter placed Plaintiff in another cell, which lacked a camera, unattended for approximately one hour without his property or a mattress. *Id.*

Plaintiff claims that he was subsequently moved to a suicide cell, where he remained for 72 hours (until August 27, 2023) without a mattress, blanket, sheet, clean clothes, "hygiene,"

toilet paper, or a shower.  [doc. # 6, pp. 3-4].  He claims that he was forced to sleep on either the floor or a "solid iron bed frame."  *Id.* at 4.  He could not "sleep for 72 hours because it was so cold [that his] bare feet on the concrete caused [his] feet, legs, and back to hurt."  [doc. # 25, p. 5].  He "begged Defendant Rodgers, Warden Wade, and others for 'any type of clothing or anything to warm [himself].'"  *Id.*  His ankles were blue, and his entire body was in pain.  *Id.* "[T]he lights stayed on constantly."  *Id.*  He suggests that he refused to eat because he did not have "any toilet paper if [he] did eat."  *Id.*  He maintains that "multiple officers, officials, and nurses" knew about his "situation."  *Id.*

In the suicide cell, Plaintiff began experiencing chest pain and shortness of breath.  [doc. #s 6, p. 4; 25, p. 5].  He claims that on August 25, 2023, he asked Lieutenant Rodgers if he could see a nurse because he had chest pain, but Rodgers "walked off."  [doc. #s 6, p. 4; 25, p. 7].  He also claims that the same day he asked Warden Wade if he could see a nurse, but Wade "refused and walked off."  [doc. # 25, p. 7].

Plaintiff claims that he was "taken off suicide watch . . . without being cleared by any medial professional."  [doc. #s 6, p. 4; 25, p. 7].

On August 27, 2023, Plaintiff lacked legal mail, a pen, paperwork, postage, and envelopes.  [doc. # 25, p. 5].  He suggests he required these items to "work on [his] civil action." *Id.*

Also on August 27, 2023, Plaintiff beat on his cell door because his cellmate covered himself with fecal matter.  [doc. # 25, pp. 5-6].  Deputy Hoff opened the door, observed Plaintiff "standing there," and pushed Plaintiff "extremely aggressively to the floor[,]" causing Plaintiff to fall in the other inmate's fecal matter.  *Id.*  Plaintiff's neck "has been hurting" following Hoff's use of force.  *Id.*

Plaintiff claims that the injury he sustained following Hoff's use of force "was ignored by RPDC officials . . . ."  [doc. # 25, p. 6].

Plaintiff was assigned to "protective custody for about two weeks[.]"[2]  [doc. # 25, p. 3]. He was confined with three other inmates in an "8' X 12' cell" containing only two bunks.  *Id.* He was "forced to sleep on the floor" approximately 6-8 inches away from a toilet.  *Id.*  He claims: "The lights stay[ed] on in the cell for 24 hrs., with no window to tell day or night.  This prevented sleep for days at a time during the 12-14 days."  *Id.*  He claims that toilets from neighboring cells "leaked feces and urine into [his] cell every day."  *Id.*  He was unable to eat most days because of the urine and feces.  *Id.* at 4.  He was only allowed to shower three times for two minutes each time "during the 12-14 days on protective custody."  *Id.*  He lacked room to exercise, walk, or stand.  *Id.*  His back, neck, and hips were in extreme pain "due to no movement."  *Id.*

While in protective custody, Plaintiff's paperwork, legal papers, envelopes, pens, paper, and case law were seized.  [doc. # 25, p. 4].  He could not "work on [his] civil action" because Wardens Wade and Cupp denied him access to the law library to study the law.  *Id.* at 4, 8. Plaintiff could not "get custody agreements or a divorce due to RPDC."  *Id.* at 8.

Plaintiff claims, "I requested grievances . . . but was denied."  [doc. # 6, p. 4].  He later filed a grievance, but he did receive a response.  *Id.*

On September 1, 2023, Plaintiff and other inmates "filed ARP's regarding the black mold that is growing in the D-Dorm shower area[,]" but he did not receive a response "from Richland Parish or DOC."  [doc. # 6, p. 4].  "Mold has been in the shower" for "the full time at RPDC.

---

[2] Plaintiff does not clearly specify the dates he was in protective custody.  He lists some dates which overlap with the dates he was allegedly assigned to a suicide cell.

[sic]."  [doc. # 25, p. 6].  Inmates in the dormitory informed two "DOC Inspectors about the mold in the shower on the wall, but DOC Inspectors ignored" them and only inspected the ceiling instead of the walls.  [doc. # 6, p. 4].  Plaintiff was "moved to G-Dorm where there is about the same amount of mold in the shower . . . ."  [doc. # 6, p. 4].  Plaintiff writes, "Without further medical testing I cannot say whether my coughing and trouble breathing [are] due to drug/trash smoke and/or black mold."  [doc. # 25, p. 6].

Plaintiff claims that from March 2023, to October 18, 2023, he was only provided recreation outside twice.  [doc. # 6, p. 5].  Officials at RPDC told him that inmates were not allowed recreation "on a regular basis" because of understaffing.  *Id.*  Plaintiff suggests that he needed outside recreation to obtain sunlight for vitamin D and fresh air for mental health.  *Id.*

Plaintiff alleges that inmates at RPDC could not see outside because there were "metal plates covering all windows and outside openings."  [doc. # 6, p. 5].

Plaintiff alleges that lights at RPDC were only turned off for three hours on weekdays and for 1.5-2 hours on weekends.  [doc. # 6, p. 5].  He suggests that he could only sleep for two hours each night because of the "constant light."  *Id.*

Plaintiff claims that the constant light, inability to see outside, and lack of recreation created "health problems and mental stress . . . ."  [doc. # 6, p. 5].  He filed grievances about the conditions of confinement, but he did not receive a response.  *Id.*

Plaintiff claims that he was subject to secondhand smoke from drugs and smoke from a trash fire.  [doc. # 6, p. 8].  He filed a grievance about the smoke on September 1, 2023.  *Id.*  According to Plaintiff, RPDC is a non-smoking facility and "only E-Cigs are allowed to inmates, anything else is prohibited[.]"  *Id.*

Plaintiff claims that from March 2023, to October 18, 2023, he was denied Jumah Service every Friday.  [doc. # 6, p. 8].  Plaintiff is a Muslim and is "commanded to attend Jumah Service."  *Id.*  "Despite RPDC having a chapel only Christians are called for church."  *Id.*

Plaintiff claims that he was denied access to the law library on multiple occasions.  [doc. # 6, p. 4].  He wanted to use the law library to prepare a civil action, research law, and copy documents.  *Id.*  He was "forced to write, prepare, and research on" a dormitory floor.  *Id.*  He suggests that he was able to obtain some books from a mobile book system, but he endured long delays and received outdated information, "creating a time consuming, limited, restricted outcome of [his] civil action preparation and research."  *Id.*  He received case law from the law library trustee after a 5-14-day delay.  [doc. # 25, p. 8].  "But that stopped completely in November . . . ."  *Id.*  He claims that he sent "digital and  physical request[s] along with multiple grievances [] to all listed defendants above."  [doc. # 25, p. 8].  He claims that all the lieutenants "verbally denied direct access to the law library" because the trustee who worked in the library was on protective custody and was living in the library.  *Id.*

Plaintiff claims that on September 4, 2023, Deputy Chapman threatened him.  [doc. # 6, p. 6].  He also claims that Wardens Wade and Cupp threatened him.  [doc. # 25, p. 8].

Plaintiff claims that on September 5, 2023, he was forced to "strip down to" his underwear "in front of multiple female officers."  [doc. # 6, p. 6].

Plaintiff claims that from September 5-11, 2023, he was assigned to "lockdown," where he lacked clean clothes, "hygiene," a towel, mail, legal paperwork, and access to a telephone and kiosk.  [doc. # 6, p. 6].

Plaintiff claims that his mail was opened in his absence on multiple occasions. [doc. # 6, p. 7]. The "originals were copied and [he] was given a copy." *Id.* He also claims that his mail was delayed "12-20 days[.]" [doc. # 25, p. 8].

On September 25, 2023, Plaintiff and another inmate "sent Warden Wade a notice of intent with a rough drafted copy of a handwritten 1983 civil action complaint . . . ." [doc. # 6, p. 8]. The "letter of intent" notified Wade that Plaintiff lacked medical care and "contain[ed] law library restriction[.] [sic]." [doc. # 25, pp. 7-8]. Plaintiff claims that he later received threats, he was assigned to lockdown, and guards ignored basic requests. [doc. # 6, p. 8].

On October 17, 2023, Lieutenant Boone "refused to let [Plaintiff] eat lunch" because one of Plaintiff's hands was not behind his back in the lunch line. [doc. # 6, p. 9].

Plaintiff claims that on 100 or more occasions the food at RPDC was uncooked, cold, or contained hair. [doc. # 6, p. 9].

Plaintiff claims that he did not receive dental care. [doc. # 25, p. 5].

Plaintiff claims that on December 13, 2023, he was transferred in retaliation to another correctional facility which was allegedly "more violent and restrictive[.]" [doc. # 25, pp. 5, 8].

Plaintiff seeks injunctive relief, declaratory relief, compensation, and punitive damages. [doc. # 6, p. 10].

## **Law and Analysis**

### **1. Preliminary Screening**

Plaintiff is a prisoner who has been permitted to proceed in forma pauperis. As a prisoner seeking redress from an officer or employee of a governmental entity, his complaint is

subject to preliminary screening pursuant to 28 U.S.C. § 1915A.[3]  *See Martin v. Scott,* 156 F.3d 578, 579-80 (5th Cir. 1998) (*per curiam*).  Because he is proceeding in forma pauperis*,* his Complaint is also subject to screening under § 1915(e)(2).  Both § 1915(e)(2)(B) and § 1915A(b) provide for *sua sponte* dismissal of the complaint, or any portion thereof, if the Court finds it is frivolous or malicious, if it fails to state a claim on which relief may be granted, or if it seeks monetary relief against a defendant who is immune from such relief.

A complaint is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989).  A claim lacks an arguable basis in law when it is "based on an indisputably meritless legal theory." *Id.* at 327.  Courts are also afforded the unusual power to pierce the veil of the factual allegations and dismiss those claims whose factual contentions are clearly baseless.  *Id.*

A complaint fails to state a claim on which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); accord *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).  Plausibility does not equate to possibility or probability; it lies somewhere in between.  *Id.*  Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim. *Twombly*, 550 U.S. at 556.

---

[3] Under 28 U.S.C. § 1915(h), "'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."

Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, supra.*  A well-pled complaint may proceed even if it strikes the court that actual proof of the asserted facts is improbable and that recovery is unlikely.  *Twombly, supra.*

In making this determination, the court must assume that all the plaintiff's factual allegations are true.  *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998).  However, the same presumption does not extend to legal conclusions.  *Iqbal, supra.*  A pleading comprised of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8.  *Id.*  A complaint fails to state a claim where its factual allegations do not "raise a right to relief above the speculative level."  *Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 148 (5th Cir. 2010) (*quoting Twombly*, 550 U.S. at 555).  "[U]nadorned, the-defendant unlawfully-harmed-me accusation[s]" will not suffice.  *Iqbal*, 556 U.S. at 677.

 "[P]laintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim."  *City of Clinton, Ark. v. Pilgrim's Pride Corp*, 632 F.3d 148, 152-53 (5th Cir. 2010).  Courts are "not free to speculate that the plaintiff 'might' be able to state a claim if given yet another opportunity to add more facts to the complaint."  *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d 94, 97 (5th Cir. 1994).

A hearing need not be conducted for every pro se complaint.  *Wilson v. Barrientos*, 926 F.2d 480, 483 n.4 (5th Cir. 1991).  A district court may dismiss a prisoner's civil rights complaint as frivolous based upon the complaint and exhibits alone.  *Green v. McKaskle*, 788 F.2d 1116, 1120 (5th Cir. 1986).

"To state a section 1983 claim, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was

committed by a person acting under color of state law." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (internal quotation marks omitted).  Consistent with the standard above, a "[S]ection 1983 complaint must state specific facts, not simply legal and constitutional conclusions." *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990).

## 2. Failure to Protect from Cutting

The Court should retain Plaintiff's claims that Deputy Morris and Deputy Austin failed to protect or prevent him from cutting his wrist.[4]

To state a failure-to-protect claim, a plaintiff must allege that a defendant's action or inaction amounted to deliberate indifference.  That is, he must allege that a defendant "knew of and disregarded a substantial risk of serious harm." *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017).  "Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001).

Here, Plaintiff's claim is not a paragon of precision.  He alleges for instance that after he asked for "suicide watch," Austin said, "we don't have any room."  [doc. # 25, p. 7].  If there was in fact no room and Austin lacked a location in which to place Plaintiff, this could indicate that Austin was not deliberately indifferent.  Similarly, the two defendants responded five minutes after Plaintiff cut his wrists.  And Plaintiff's allegations concerning what Deputies Austin and Morris knew is thin.  For example, he does not allege that they knew he had a razor blade capable of cutting his wrists, that he intended to use a razor blade, or that he had a history of self-harm or suicidal tendencies.

However, construing Plaintiff's allegations liberally and in his favor, it is at least

---

[4] Plaintiff appears to fault certain defendants for failing to prevent him from cutting his wrist, failing to protect him from a risk of further self-harm or suicidal ideations after he cut his wrist, and failing to provide medical care for the injuries to his wrist.

plausible that Deputies Morris and Austin knew of a substantial risk of serious harm when Plaintiff "requested to go on suicide watch" and stated he was suicidal.[5]  He also plausibly alleges that Morris and Austin were deliberately indifferent to that risk when they failed to take any action within at least one hour after Plaintiff informed them that he was suicidal.[6, 7]  *See Converse v. City of Kemah, Texas*, 961 F.3d 771, 778 (5th Cir. 2020) (officer displayed deliberate indifference "streaming television shows instead of monitoring the video of" suicidal detainee's cell for forty-five minutes).

---

[5] *See, e.g., Sanville v. McCaughtry*, 266 F.3d 724, 737-38 (7th Cir. 2001) ("Particularly if Matt told them that he was suicidal, that alone should have been enough to impute awareness of a substantial risk of suicide."); *Olson v. Bloomberg*, 339 F.3d 730, 736-37 (8th Cir. 2003) ("[T]here was direct, first-hand communication from Gacek to Hauglin of Gacek's intent to commit suicide and the method by which Gacek intended to carry out his threat. These alleged facts are sufficient to show that Hauglin knew firsthand of a 'substantial risk of serious harm,' knew it was an immediate threat, and saw that Gacek had selected a method and had equipment at hand.") (citations omitted); *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) ("Officer Shuck is in a different position because Collins specifically told him that he was feeling suicidal.").

[6] In *Baldwin v. Dorsey*, 964 F.3d 320, 327 (5th Cir. 2020), the Fifth Circuit opined: "The central fact relied on by the district court is that [Deputy] Dorsey t[ook] *no* action for almost three hours after learning of Plaintiff's suicidal ideations and possible overdose just hours earlier.  Yet it is undisputed that Dorsey took Baldwin to a nurse within three hours and to the hospital for suicide evaluation within four hours.  Three hours' delay in directly responding to a medical need, at least on the facts alleged here, is not the same as never taking responsive action at all."  But *Baldwin* is distinguishable.  For instance, *Baldwin* was limited to the "facts alleged[.]"  It was also adjudicated at the summary judgment stage.  In addition, the Fifth Circuit applied a different standard than the one applicable here (presumably because the plaintiff was an arrestee), concluding in part that the plaintiff's theory of liability failed because the defendant proffered a legitimate governmental reason for the delay.  Further, the defendant there took the plaintiff— who sustained different injuries than Plaintiff here—to a nurse.  But in the relevant period here— from when Plaintiff informed defendants that he was suicidal to when he cut his wrist— defendants allegedly failed to take any action.

[7] A deliberate indifference standard also applies to the extent Plaintiff claims that Morris and Austin failed to provide medical care before he cut his wrist.

**3. Medical Care and Failure to Protect from Further Self-Harm**

As above, Plaintiff cut his wrist with a razor, causing approximately 10 cuts 2-4 inches in length.  Another inmate beat on the cell door and screamed, "He's trying to kill himself."  Deputy Austin arrived five minutes later and contacted Defendant Alan.  Lieutenant Alan removed Plaintiff from the cell and stated: "You aint trying to kill yourself!  But at least you're cutting in the right direction!"

Plaintiff was then placed in a hallway unattended and without medical attention while Lt. Alan and other deputies questioned other inmates that were in the cell about what happened.  Defendants Alan, Morris, and Austin thereafter placed Plaintiff in another cell, which lacked a camera, unattended for approximately one hour without his property or a mattress.

A. <u>Failure to Protect from Further Self-Harm</u>

Plaintiff does not plausibly allege that Alan, Morris, or Austin was deliberately indifferent to further risk of self-harm.  Deputy Austin arrived five minutes later, and Plaintiff does not allege that Austin knew Plaintiff was cutting himself before Austin could respond; in other words, he does not allege that Austin delayed responding.  Moreover, Austin contacted Defendant Alan, removed Plaintiff from the cell, and placed Plaintiff in a hallway outside of the cell while Alan and others questioned inmates about what happened.  Absent more, these actions do not bespeak deliberate indifference.

Likewise, placing Plaintiff unattended in another cell which lacked a camera for approximately one hour without his property or a mattress does not reflect deliberate indifference.  Plaintiff does not plausibly allege that he was exposed to a substantial risk of serious self-harm during the relatively brief time he was in the hallway and subsequent cell.  And he does not allege, for instance, that any defendant knew he harbored further suicidal ideations

after his attempted suicide or that he still had razors or other means or opportunities to inflict self-harm.  In fact, he suggests defendants confiscated his razor, alleging that he lacked all his property.  Finally, Lieutenant Alan's alleged statements, however crass, do not amount to a constitutional violation.[8]

The Court should dismiss these claims against Defendants Alan, Morris, and Austin.

B. Medical Care

Plaintiff appears to also frame the same allegations as a claim that Alan, Morris, and Austin failed to provide medical care after he cut his wrist.  He states that he "was not allowed to see or speak to any medical professional before, during, or after [his] suicide attempt."  [doc. # 6, p. 4].

To plead a constitutional violation, a plaintiff "must demonstrate that a government official was deliberately indifferent to 'a substantial risk of serious medical harm.'"  *Bailey v. E. Baton Rouge Par. Prison*, 663 F. App'x 328, 330 (5th Cir. 2016) (*quoting Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000)).  A prison official acts with deliberate indifference to an inmate's health "only if he knows that [the] inmate[ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see Reeves v. Collins*, 27 F.3d 174, 176-77 (5th Cir. 1994) (applying *Farmer* to a denial of medical care claim).  A plaintiff must establish that a prison official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

---

[8] Allegations of mere verbal abuse by prison guards simply do not give rise to a cause of action under Section 1983.  *Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993).

"[N]either an incorrect diagnosis nor the failure to alleviate a significant risk that should have been perceived, but was not, is sufficient to establish deliberate indifference." *Blank v. Bell*, 634 F. App'x 445, 448 (5th Cir. 2016). "Unsuccessful treatment, medical malpractice, and acts of negligence do not constitute deliberate indifference; nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances. Moreover, a delay in treatment is not unconstitutional, unless there has been deliberate indifference that results in substantial harm. In short, [d]eliberate indifference is an extremely high standard to meet." *Id.* (internal quotation marks and quoted sources omitted); *see Alton v. Tex. A & M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999) ("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference."); *Frazier v. Keith*, 707 F. App'x 823, 824 (5th Cir. 2018) ("The choice between forms of treatment is a classic example of a matter of professional judgment and does not support a finding of deliberate indifference.").

Here, like above, Deputy Austin's arrival five minutes later and removal of Plaintiff from the cell do not amount to deliberate indifference. However, Plaintiff plainly had serious medical needs—cut wrists and suicidal ideations—and he alleges that Alan, Morris, and Austin assigned him to a cell without providing any medical attention. That Defendants Alan, Morris, and Austin failed to provide or arrange emergency medical care to Plaintiff after he attempted suicide plausibly reflects deliberate indifference to a substantial risk of serious harm. *See Cope v. Cogdill*, 3 F.4th 198, 209 (5th Cir. 2021) (making clear that promptly failing to call for emergency assistance when an inmate "faces a known, serious medical emergency—e.g., suffering from a suicide attempt—constitutes unconstitutional conduct."); *Austin v. City of Pasadena, Texas*, 74 F.4th 312, 328 (5th Cir. 2023) ("Deliberate indifference may be established

14

through inferences arising from circumstantial evidence, and a factfinder may infer the requisite knowledge from the fact that the risk of harm was 'obvious.'") (citation omitted).[9]

The Court should retain this claim of constitutionally inadequate medical care against Alan, Morris, and Austin.

## 4. Conditions of Confinement in Suicide Cell

Plaintiff claims that he was moved to a suicide cell, where he remained for 72 hours (until August 27, 2023) without a mattress, blanket, sheet, clean clothes, "hygiene," toilet paper, or a shower.  [doc. # 6, pp. 3-4].  He claims that he was forced to sleep on either the floor or a "solid iron bed frame."  *Id.* at 4.  He could not "sleep for 72 hours because it was so cold [that his] bare feet on the concrete caused [his] feet, legs, and back to hurt."  [doc. # 25, p. 5].  He "begged Defendant Rodgers, Warden Wade, and others for 'any type of clothing or anything to warm [himself],'" but he was denied.  *Id.*  His ankles were blue, and his entire body was in pain. *Id.*  "[T]he lights stayed on constantly."  *Id.*  He suggests that he refused to eat because he did not have "any toilet paper if [he] did eat."  *Id.*  He maintains that "multiple officers, officials, and nurses" knew about his "situation."  *Id.*

"While the Constitution does not require that custodial inmates be housed in comfortable prisons, the Eighth Amendment's prohibition against cruel and unusual punishment does require

---

[9] *See also Dyer v. Houston*, 964 F.3d 374, 384-85 (5th Cir. 2020) ("Officers had custody of a delusional detainee who was severely harming himself, and yet—despite being aware of the detainee's dire condition—they did nothing to secure medical help. . . .  [T]he Officers actually witnessed Graham violently slamming his head against the patrol car over and over again, inflicting the cerebral trauma that would kill him within about a day's time.  And yet, instead of seeking medical assistance, the Officers deposited Graham at the jail . . . ."); *Est. of Bonilla by & through Bonilla v. Orange Cnty., Texas*, 982 F.3d 298, 307 (5th Cir. 2020) ("If Bonilla had exhibited signs of serious physical or psychological distress while detained, the staff's failure to address those needs by providing her with necessary medication may have violated her established right to medical care.").

that prisoners be afforded 'humane conditions of confinement' and prison officials are to ensure that inmates receive adequate food, shelter, clothing, and medical care." *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001) (*quoting Farmer v. Brennan*, 511 U.S. 825 (1994)).  To establish an Eighth Amendment violation, a prisoner must demonstrate that a prison official was deliberately indifferent to conditions that resulted in the "extreme deprivation[,]" *Shannon v. Vannoy*, 682 F. App'x 283, 285 (5th Cir. 2017), of the "minimal civilized measure of life's necessities."[10]  *Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008).  To establish deliberate indifference, the prisoner must show that the official knew of and disregarded an excessive risk to inmate health or safety; the official must have been both aware of facts from the inference could be drawn that a substantial risk of serious harm exists, and he must have drawn the inference.  *Farmer*, 511 U.S. at 837.

"*Some* conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (internal quotation marks and quoted source omitted).[11]  However, "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists."

---

[10] The deprivation alleged must be, objectively, sufficiently serious.  *Farmer*, 511 U.S. at 834. This standard is not static: the inquiry is whether the conditions are contrary to "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quotation marks and quoted source omitted).

[11] "Such things as food, sleep, clothing, shelter, medical attention, reasonable safety, sleep, and exercise have been recognized by courts as basic physical human needs subject to deprivation by conditions of confinement." *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678 (M.D. La. 2007) (citing cases).

*Id.* at 305.

Here, Plaintiff does not plausibly allege that any defendant was deliberately indifferent. At best, he alleges that he "begged Defendant Rodgers, Warden Wade, and others for any type of clothing or anything to warm [himself]," but he was denied.  However, he does not allege that Rodgers or Wade knew of a substantial risk of serious harm from cold exposure or lack of warmth.  He does not allege that Rodgers or Wade *knew* (1) that he could not "sleep for 72 hours because it was so cold [that his] bare feet on the concrete caused [his] feet, legs, and back to hurt" or (2) that his ankles were blue, and his entire body was in pain.  Further, although he asked Wade and Rodgers for clothing at some unspecified time during his 72-hour period of confinement, he does not allege that he lacked clothing; rather, he only alleges that he lacked clean clothing.

Nor does Plaintiff allege that any defendant knew of the other conditions in which he was confined or the life needs he lacked.  He maintains that "multiple officers, officials, and nurses" knew about his "situation[,]" but he does not identify a responsible defendant.  He does not sufficiently identify "any particular defendant's personal involvement in conduct that caused constitutional deprivation."  *See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 421 (5th Cir. 2017) (dismissing a claim that supervisory officials failed to correctly house the plaintiff because despite the magistrate judge's instruction to "state what each defendant did[,]" the plaintiff did not identify a responsible defendant).  The Court disregards bare assertions of collective responsibility unsupported by concrete factual allegations.  *See Martinez v. City of N. Richland Hills*, 846 F. App'x 238, 243 (5th Cir. 2021); *Jones v. Hosemann*, 812 F. App'x 235, 238-39 (5th Cir. 2020) ("It is not enough for a plaintiff to simply allege that something

unconstitutional happened to him.  The plaintiff must plead that each defendant individually engaged in actions that caused the unconstitutional harm.").

The Court should dismiss these claims.

## 5. Medical Care for Chest Pain and Shortness of Breath

In the suicide cell, Plaintiff began experiencing chest pains and shortness of breath which "created a deeper state of depression."  [doc. #s 6, p. 4; 25, pp. 5, 7].  He claims that on August 25, 2023, he asked Lieutenant Rodgers if he could see a nurse for his chest pain, but Rodgers "walked off."  [doc. #s 6, p. 4; 25, p. 7].  Plaintiff does not definitively allege that he informed Rodgers of his shortness of breath.  *Id.*  He does state that Rodgers knew he previously attempted suicide.  [doc. # 25, p. 7].

Plaintiff's allegations are terse, but construing them liberally and in his favor he plausibly alleges that he had a serious medical need and that Rodgers knew of, yet disregarded, a substantial risk of serious harm.  The Court should retain this claim against Rodgers.

Plaintiff next claims that the same day he asked Warden Wade if he could see a nurse, but Wade "refused and walked off."  [doc. # 25, p. 7].  Plaintiff, however, does not allege what Warden Wade knew.  He does not allege that he asked Wade for medical care for chest pain or shortness of breath.  Rather, he only states that he asked for a nurse.  *Id.*  Absent more, Plaintiff does not present a plausible claim against Warden Wade.  The Court should dismiss this claim against Warden Wade.

## 6. Identifying a Responsible Defendant

Plaintiff fails to identify and specify a responsible defendant(s) for the following manifold claims:

○ He  was "taken off suicide watch . . . without being cleared by any medial professional."  [doc. #s 6, p. 4; 25, p. 7].

18

○ On August 27, 2023, he lacked legal mail, a pen, paperwork, postage, and envelopes. [doc. # 25, p. 5]. He suggests he required these items to "work on [his] civil action." *Id.*

○ The injury he sustained following Hoff's use of force "was ignored by RPDC officials . . . ." [doc. # 25, p. 6].

○ He was assigned to "protective custody for about two weeks[.]" [doc. # 25, p. 3]. He was confined with three other inmates in a "8' X 12' cell" which had only two bunks. *Id.* He was "forced to sleep on the floor" approximately 6-8 inches away from a toilet. *Id.* "The lights stay[ed] on in the cell for 24 hrs., with no window to tell day or night. This prevented sleep for days at a time during the 12-14 days." *Id.* He claims that toilets from neighboring cells "leaked feces and urine into [his] cell every day." *Id.* He was unable to eat most days because of the urine and feces. *Id.* at 4. He was only allowed to shower three times for two minutes each time "during the 12-14 days on protective custody." *Id.* He lacked room to exercise, walk, or stand. *Id.* His back, neck, and hips were in extreme pain "due to no movement." *Id.*

○ His grievances were denied. [doc. # 6, p. 4].

○ On September 1, 2023, Plaintiff and other inmates "filed ARP's regarding the black mold that is growing in the D-Dorm shower area[,]" but he did not receive a response "from Richland Parish or DOC." [doc. # 6, p. 4]. "Mold has been in the shower" for "the full time at RPDC. [sic]." [doc. # 25, p. 6]. Inmates in the dormitory informed two "DOC Inspectors about the mold in the shower on the wall, but DOC Inspectors ignored" them and only inspected the ceiling instead of the walls. [doc. # 6, p. 4]. Plaintiff was "moved to G-Dorm where there is about the same amount of mold in the shower . . . ." [doc. # 6, p. 4]. Plaintiff writes, "Without further medical testing I cannot say whether my coughing and trouble breathing [are] due to drug/trash smoke and/or black mold." [doc. # 25, p. 6].

○ From March 2023, to October 18, 2023, he was only provided recreation outside twice. [doc. # 6, p. 5]. Officials at RPDC told him that inmates were not allowed recreation "on a regular basis" because of understaffing. *Id.*

○ Inmates at RPDC could not see outside because there were "metal plates covering all windows and outside openings." [doc. # 6, p. 5].

○ Lights at RPDC were only turned off for three hours on weekdays and for 1.5-2 hours on weekends. [doc. # 6, p. 5]. Plaintiff suggests that he could only sleep for two hours each night because of the "constant light." *Id.*

○ The constant light, inability to see outside, and lack of recreation created "health problems and mental stress . . . ."  [doc. # 6, p. 5].

○ He was subject to secondhand smoke from drugs and smoke from a trash fire. [doc. # 6, p. 8].  According to Plaintiff, RPDC is a non-smoking facility and "only E-Cigs are allowed to inmates, anything else is prohibited[.]"  *Id.*

○ From March 2023, to October 18, 2023, he was denied Jumah Service every Friday.  [doc. # 6, p. 8].  Plaintiff is a Muslim and is "commanded to attend Jumah Service."  *Id.*  "Despite RPDC having a chapel only Christians are called for church."  *Id.*

○ He was denied access to the law library on multiple occasions.  [doc. # 6, p. 4].  He wanted to use the law library to prepare a civil action, research law, and copy documents.  *Id.*  He was "forced to write, prepare, and research on" a dormitory floor.  *Id.*  He suggests that he was able to obtain some books from a mobile book system, but he endured long delays and received outdated information, "creating a time consuming, limited, restricted outcome of [his] civil action preparation and research."  *Id.*  He received case law from the law library trustee after a 5-14-day delay.  [doc. # 25, p. 8].  "But that stopped completely in November . . . ."  *Id.*

○ On September 5, 2023, he was forced to "strip down to" his underwear "in front of multiple female officers."  [doc. # 6, p. 6].

○ From September 5-11, 2023, he was assigned to "lockdown," where he lacked clean clothes, "hygiene," a towel, mail, legal paperwork, and access to a telephone and kiosk.  [doc. # 6, p. 6].

○ His mail was opened in his absence.  [doc. # 6, p. 7].  The "originals were copied and [he] was given a copy."  *Id.*  His mail was delayed "from 12-20 days[.]"  [doc. # 25, p. 8].

○ After he "sent Warden Wade a notice of intent," he received threats, was assigned to lockdown, and guards ignored basic requests.  [doc. # 6, p. 8].

○ He did not receive dental care.  [doc. # 25, p. 5].

○ On December 13, 2023, he was transferred in retaliation to another correctional facility which was allegedly "more violent and restrictive[.]"  [doc. # 25, pp. 5, 8].

Accordingly, the Court should dismiss these claims.  *See Armstrong v. Ashley*, 60 F.4th 262, 274-75 (5th Cir. 2023) ("Armstrong's allegation also suffers from the distinct problem of

group pleading: she simply faults the eight Law Enforcement Defendants as a group without factual material suggesting that any particular defendant suppressed evidence.  Armstrong's allegation is independently insufficient for that reason since a § 1983 plaintiff must plead that each Government-official defendant, though the official's own individual actions, has violated the Constitution.").

### 7.  Excessive Force

On August 27, 2023, Plaintiff's cellmate covered himself with fecal matter.  [doc. # 25, pp. 5-6].  Plaintiff began beating on the cell door because of the smell.  *Id.*  Deputy Hoff opened the door, observed Plaintiff "standing there," and pushed Plaintiff "extremely aggressively to the floor[,]" causing Plaintiff to fall in the other inmate's fecal matter.  *Id.* Plaintiff's neck "has been hurting" following Hoff's use of force.  *Id.*  He suggests that he unsuccessfully sought medical care for his injury.  *Id.* at 6.

When a prison official is accused of using excessive physical force in contravention of the Eighth Amendment's Cruel and Unusual Punishments Clause, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (*citing Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).  "Force beyond that reasonably required to maintain or restore discipline is 'wanton and unnecessary.'"  *Perez v. Collier*, 2021 WL 4095263, at *2 (5th Cir. Sept. 8, 2021) (*quoting Hudson*, 503 U.S. at 7).  "This standard looks to an official's subjective intent to punish."  *Id.*

However, not every malevolent touch by a prison guard gives rise to a federal cause of action.  *Hudson*, 503 U.S. at 9.  The Eighth Amendment does not protect against "*de minimis*" use of physical force, so long as the use of force is not of a sort "repugnant to the conscience of

mankind." *Id.* (citation and internal quotation marks omitted).  Courts consider the following

factors: (1) the extent of the injury suffered; (2) the need for application of force; (3) the

relationship between that need and the amount of force used; (4) the threat reasonably perceived

by the responsible officials; and (5) any effort made to temper the severity of a forceful response.

*Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999).

Here, Plaintiff's neck pain, as he describes it, approaches de minimis status.[12]  However,

he does suggest that he sought medical care for the injury.  Further, "[A]lthough a *de*

*minimis* injury is not cognizable, the extent of injury necessary to satisfy the injury requirement

is 'directly related to the amount of force that is constitutionally permissible under the

circumstances.'" *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017 (alteration

in original) (*quoting Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013)).  Accordingly, "[a]ny

force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold, and,

conversely, objectively reasonable force will result in *de minimis* injuries only." *Id.* (*quoting*

*Brown*, 524 F. App'x at 79).

In other words, "as long as a plaintiff has suffered 'some injury,' even relatively

insignificant injuries and purely psychological injuries will prove cognizable when resulting

from an officer's unreasonably excessive force." *Id.* (*quoting Brown*, 524 F. App'x at 79).  This

means that if the use of force was unreasonably excessive, Plaintiff here only needs to show

---

[12] *See Haddix v. Kerss*, 203 F. App'x 551, 554 (5th Cir. 2006) ("Haddix also alleged that Corporal House once kicked him in the ankle to awaken him.  Haddix alleged he suffered pain, but he did not allege that he suffered pain for any length of time or that he sought any medical treatment. Such a non-specific assertion of injury supports a finding that any injury was de minimis."); *Westfall v. Luna*, 903 F.3d 534, 549-50 (5th Cir. 2018) (holding that abrasions, bruises, bloody urine and high blood pressure were *de minimis* injuries);  *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022) (holding that abrasions to the face, head and tricep bruises, and mental trauma were minor injuries).

"some injury"—a bar he clears. *See Solis v. Serret*, 31 F.4th 975, 982 (5th Cir. 2022) (holding that nerve pain and a pulling pain was enough injury); *Bone v. Dunnaway*, 657 Fed. Appx. 258, 262 (5th Cir. 2016) ("Although Bone's allegation of injury could be characterized as de minimis—bruising and a swollen cheek—whether an injury is cognizable depends on the reasonableness of the force, not just the extent of injury."); *Schmidt v. Gray*, 399 Fed. Appx. 925, 928 (5th Cir. 2010) (pain, soreness, and bruising resulting from an officer's slamming a car's trunk lid on a suspect's finger was a legally cognizable injury).

As to the second factor above, Plaintiff suggests that there was little to no need for force. He was simply "standing there" when Deputy Hoff opened the cell door and pushed him to the floor. And Plaintiff does not indicate that he defied any order or rule requiring him to, for instance, stand back when an officer opened the cell door. Even assuming, for example, Hoff needed Plaintiff to move from the threshold, Plaintiff suggests that Hoff's "extremely aggressive" push was force which exceeded any such need.

Considering the next factor, Plaintiff's allegations do not clearly reveal any threat reasonably perceived by Hoff. And turning to the final factor, there is no indication that Hoff made any effort made to temper the severity of a forceful response.

Construing Plaintiff's allegations liberally and in his favor at this early stage of the proceeding, the Court should retain this claim.

## 8. Access to Court

While in protective custody, Plaintiff's paperwork, legal papers, envelopes, pens, paper, and case law were seized. [doc. # 25, p. 4]. He could not "work on [his] civil action" because Wardens Wade and Cupp denied him access to the law library to study the law. *Id.* at 4, 8. He could not "get custody agreements or a divorce due to RPDC." *Id.* at 8.

To succeed on a claimed denial of access to courts, a plaintiff must show that he lost an actionable claim or was prevented from presenting such a claim because of the alleged denial. *Lewis v. Casey*, 518 U.S. 343, 356 (1996); *Eason v. Thaler*, 73 F.3d 1322, 1328 (5th Cir. 1996) (holding that to state a claim of denial of access to the courts, a plaintiff must demonstrate that his position as a litigant was prejudiced as a direct result of the denial of access). "[T]he complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Christopher v. Harbury*, 536 U.S. 403, 417-18 (2002).

The "injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 U.S. at 353. Rather, a plaintiff must demonstrate that the lack of access prevented him from filing or caused him to lose a case that attacks either his conviction or seeks "to vindicate 'basic constitutional rights'" in a civil rights action. *Id.* at 353-54 (*quoting Wolff v. McDonnell*, 418 U.S. 539, 579 (1974)).

"Denial-of-access claims take one of two forms: forward-looking claims alleging 'that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time,' and backward-looking claims alleging that an official action has 'caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief.'" *Waller v. Hanlon*, 922 F.3d 590, 601 (5th Cir. 2019) (*quoting Christopher*, 536 U.S. at 413-14).

"To maintain a backward-looking claim, a plaintiff must identify (1) a nonfrivolous underlying claim; (2) an official act that frustrated the litigation of that claim; and (3) a remedy that is not otherwise available in another suit that may yet be brought." *United States v. McRae*,

702 F.3d 806, 830-31 (5th Cir. 2012); *see Christopher*, 536 U.S. at 413-14 (("These cases do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable.").

With respect to the inability to access a library or a claim that a library was deficient, an inmate must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351. "He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint." *Id.* "[A]n inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Id.* The "inmate must show that a nonfrivolous, arguable claim he wished to bring has been lost or rejected due to the deficiency or that the deficiency is currently preventing his presentation of such a claim." *Sanchez v. Stephens*, 689 F. App'x 797, 799 (5th Cir. 2017).

Here, Plaintiff states that because he lacked legal materials and access to the law library, he could not "get custody agreements or a divorce due to RPDC." However, those underlying state law issues or proceedings are not claims that either attack a conviction or seek "to vindicate 'basic constitutional rights'" in a civil rights action. Even assuming they concerned basic constitutional rights, Plaintiff does not sufficiently identify a non-frivolous, arguable underlying claim.

The Court should dismiss these claims.

**9. Threats**

Plaintiff claims that on September 4, 2023, Deputy Chapman threatened him.  [doc. # 6, p. 6].  He also claims that Wardens Wade and Cupp threatened him.  [doc. # 25, p. 8].

Verbal threats, without more, do not support a claimed constitutional violation.  *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997); *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983).  Allegations of mere verbal abuse by prison guards simply do not give rise to a cause of action under Section 1983.  *Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993); *Siglar*, 112 F.3d at 191.  "[M]ere allegations of verbal abuse or epithets, reprehensible though they may be, do not amount to a cognizable constitutional violation under Section 1983."  *Matthews v. LeBlanc*, 2022 WL 2951759, at *1 (5th Cir. July 26, 2022).

Plaintiff does not state a claim of constitutional dimension.  The Court should dismiss these claims.

**10. Other Conditions of Confinement**

On October 17, 2023, Lieutenant Boone "refused to let [Plaintiff] eat lunch" because one of Plaintiff's hands was not behind his back in the lunch line.  [doc. # 6, p. 9].

Plaintiff does not describe an extreme deprivation of food or a substantial risk of serious harm from missing one meal.  *See Aucoin v. Terrebonne Par. Sheriff's Off.*, 2022 WL 16657429, at *1 (5th Cir. Nov. 3, 2022) ("As to his claims of missing one meal on one day, Aucoin did not allege or explain how a substantial risk of serious harm existed to his health based on one missed meal."); *Jarrow v. Taylor*, 2022 WL 7409255, at *1 (5th Cir. Oct. 13, 2022) ("[H]e failed to state a facially plausible claim of an Eighth Amendment violation, considering the minimal amount and duration of deprivation associated with one missed meal."); *Smith v. Windham*, 2023 WL 4904318, at *1 (5th Cir. Aug. 1, 2023).

Next, Plaintiff claims that on 100 or more occasions the food at RPDC was uncooked, cold, or had hair in it.  [doc. # 6, p. 9].  That Plaintiff's food was uncooked, cold, or had hair in it on occasion does not plausibly amount to an extreme deprivation of food or a substantial risk of serious harm.  Plaintiff does not allege, for instance, that he was denied adequate nutrition and that consequently he suffered physical harm.  *See Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999) (denying a claim of inadequate food because the plaintiff did not allege "any specific physical harm," did not allege "that he lost weight or suffered other adverse physical effects or was denied a nutritionally and calorically adequate diet," and did not allege "having his health put at risk."); *Hyder v. Perez*, 85 F.3d 624 (5th Cir. 1996) (finding no plausible claim where the plaintiff alleged that he received inadequate amounts of food, causing him "hunger pains, headaches, decreased energy, weight loss, and emotional distress."); *Lowe v. Richardson*, 2011 WL 1533426, at *1 (5th Cir. Apr. 22, 2011) (holding that an allegation "that the meals were served too cold, not that they were nutritionally insufficient . . . did not state a constitutional claim.").[13]

The Court should dismiss these claims.

## 11. Injunctive and Declaratory Relief

Plaintiff seeks injunctive and declaratory relief.  Plaintiff was, however, transferred from RPDC to a different facility on approximately December 13, 2023.  [doc. # 21].

---

[13] *See also Logan v. Black*, 983 F.2d 1063 (5th Cir. 1993) ("Appellant's claim that his food is sometimes served cold, is not a violation of his constitutional rights, and as such does not state a cognizable claim under 28 U.S.C. 1983."); *Delgado v. U.S. Marshals*, 618 F. App'x 236, 237 (5th Cir. 2015) (holding that cold food, poor-quality linens, and limited toilet paper may have been unpleasant, but they were not inhumane conditions); *Umar v. Burkett*, 996 F.2d 304 (5th Cir. 1993) (holding that "cold food does not state a constitutional deprivation.").

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969); *Rocky v. King*, 900 F.2d 864, 867 (5th Cir. 1990). Litigants "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation and citation omitted).

"This case-or-controversy requirement persists through all stages of federal judicial proceedings." *Dierlam v. Trump*, 977 F.3d 471, 476 (5th Cir. 2020). "If an intervening event renders the court unable to grant the litigant any effectual relief whatever, the case is moot." *Id.* "A claim for declaratory and injunctive relief based on conditions of confinement is rendered moot upon the prisoner's release or transfer from the facility." *Smith v. City of Tupelo, Mississippi*, 281 F. App'x 279, 282 (5th Cir. 2008).

Mootness is jurisdictional and must be raised sua sponte. *Bailey v. Southerland*, 821 F.2d 277, 278 (5th Cir. 1987).

Here, because Plaintiff is no longer incarcerated at RPDC, his requests for injunctive and declaratory relief are moot.[14] *See Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (determining that an inmate's transfer to a different unit rendered claims for declaratory and injunctive relief moot); *Lee v. Richland Par. Det. Ctr.*, 483 F. App'x 904 (5th Cir. 2012) (affirming that a detainee's request for injunctive relief was moot because the detainee was no

---

[14] Plaintiff does not allege or suggest, and the record does not reveal, that there is a reasonable, demonstrable probability that he will return to RPDC. *See Hardwick v. Brinson*, 523 F.2d 798, 800 (5th Cir. 1975); *Murphy v. Hunt*, 455 U.S. 478, 482 (1982).

longer housed at the detention center).  The Court should therefore dismiss Plaintiff's requests for injunctive and declaratory relief.

<u>**Recommendation**</u>

For the reasons above, **IT IS RECOMMENDED** that—excepting Plaintiff Dylan Guillot's claims that Deputy Morris and Deputy Austin failed to protect him from cutting himself, that Defendants Alan, Morris, and Austin failed to provide constitutionally adequate medical care, that Lieutenant Rodgers failed to provide or arrange medical care while Plaintiff was in a suicide cell, and that Deputy Hoff utilized excessive force—Plaintiff's claims be **DISMISSED WITH PREJUDICE** as frivolous and for failing to state claims on which relief may be granted.

**IT IS FURTHER RECOMMENDED** that Plaintiff's requests for injunctive and declaratory relief be **DENIED AS MOOT**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).**

In Chambers, Monroe, Louisiana, this 12th day of February, 2024.

Kayla Dye McClusky
United States Magistrate Judge